No. 103,289

STATE OF KANSAS, *Appellee*, v. RICKEY MARKS, *Appellant*.

(298 P.3d 1102)

Opinion filed April 19, 2013.

*Heather Cessna*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jennifer S. Tatum*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Rickey Marks directly appeals his conviction for the first-degree premeditated murder of his wife, arguing: (1) the prosecutor committed misconduct during closing arguments; (2) the district court erred when it denied his motion in limine to exclude evidence that his wife filed for divorce in the weeks prior to her murder; (3) the Wyandotte County District Attorney's open file discovery policy violates K.S.A. 22-3212 and K.S.A. 22-3213; and (4) cumulative error deprived him of a fair trial. We hold the prosecutor misstated the law on premeditation and that Marks was entitled to copies of the discovery under K.S.A. 22-3212 and K.S.A. 22-3213. Both errors were harmless in this case, and we affirm his conviction.

## FACTUAL AND PROCEDURAL HISTORY

On October 11, 2008, Rozeta Marks was stabbed eight times in her chest, arm, and back while driving to a store with her husband, Rickey Marks. According to a medical examiner who testified at trial, Rozeta's wounds were on the left side of her body, indicating she was stabbed through the driver's side window. The fatal stab entered between Rozeta's ribs and into her heart. Marks was ul-

timately charged with and convicted of first-degree premeditated murder.

At trial, Rozeta's friend Judith Williams testified that a few weeks before the stabbing, Rozeta visited her in Tennessee. Williams said that during that visit Marks called Rozeta approximately 60 times and accused her of infidelity. He also left numerous threatening voicemails and text messages in which he said Rozeta must have been scared of him and that she was "dead" when she returned.

Williams testified that Rozeta secretly filed for divorce during the Tennessee visit, telling Williams that she did not want Marks to know. Rozeta left the divorce papers in Tennessee so that Marks would not find them. After returning home, Rozeta sent Williams a text message saying, "He dont believe that i'm getting a divorce. Keep begging PLEASE DONT[.] GIVE ME ANOTHER CHANCE."

Before trial, Marks' attorney filed a motion in limine seeking to exclude evidence that Rozeta filed for divorce shortly before her death. He conceded the divorce evidence would be relevant if there was additional evidence that Marks knew Rozeta had filed but claimed there was none and that any divorce evidence was therefore irrelevant and extremely prejudicial. The district court denied Marks' motion, which he unsuccessfully renewed on the morning of trial.

Sometime after Rozeta returned home, she and Marks drove to the house of one of Marks' brothers, Reginald, to pick up some unused tools to return to a store. According to Reginald's trial testimony, Marks did not act agitated or angry at the time, and Rozeta waved at him from the car. Williams also testified that she spoke to Rozeta before the stabbing and that Rozeta sounded "fine."

Reginald further testified that about 15 to 20 minutes after Marks and Rozeta left his home, Marks' other brother, Stephen, yelled for him to dial 911. Stephen testified that he observed Rozeta stagger in the street, look "wobbly," and ultimately fall down. Stephen said Rozeta told him she had been stabbed, and Stephen saw Marks drive off "kind of fast" in Rozeta's car.

Several people testified at trial that shortly after the stabbing, Marks telephoned them saying that he had stabbed Rozeta. One of them was Williams' husband in Tennessee, who testified that

Marks said, "I killed the bitch. . . . I stabbed her 20 times." Marks was arrested later the day of the stabbing at a sandwich shop. One officer said Marks had a contusion on his forehead from falling in the parking lot but did not have any other noticeable injuries. Neither the car nor the murder weapon was ever recovered.

Marks testified in his own defense that he could not find the receipt for the tools, which he would need to return them. He said once Rozeta learned he lost the receipt, a heated argument began during which Rozeta became "irate" because she wanted the money and Marks had a bad habit of losing receipts. Marks also testified that Rozeta stopped the car and told him to get out and that "pissed [him] off" and he refused.

According to Marks, this was when Rozeta pulled a knife from under the car seat. He testified that Rozeta raised the knife like she was going to stab him, and a "tussl[e]" began during which he grabbed her hand and wrestled for the knife. Marks said Rozeta "lunged" towards him and that was when "this happened." According to Marks, he became upset and tearful after the stabbing. He said Rozeta got out of the car and started walking down the street. Marks said he told her to get back in so they could go to the hospital, but Rozeta refused. When she would not return, Marks said he got in the driver's seat and drove away.

After retiring for deliberations, the jury submitted a question to the court, asking: "While premeditation has no specific time frame is there a reasonable definition of 'instantaneous'? In other words, if someone decides to act and then acts is that gap of time sufficient to declare pre-med?" The judge replied: "Ladies and Gentlemen, I cannot give you a better definition of premeditation than that contained in [the instruction]. Please re-read the definition of premeditation in [the instruction]."

The jury convicted Marks of first-degree premeditated murder. He was sentenced to life in prison with a minimum confinement of 25 years. This court has jurisdiction under K.S.A. 2012 Supp. 22-3601 (life sentence; off-grid crime).

## PROSECUTOR'S CONDUCT

During closing arguments, the prosecutor explained to the jury

regarding premeditation that "intent can be formed *during the act itself*." (Emphasis added.) But in the district court's instructions for first-degree premeditated murder, second-degree intentional murder, voluntary manslaughter, and involuntary manslaughter, the jury received the standard PIK definition for premeditation as follows:

"Premeditation means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill *before the act*. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." (Emphasis added.)

Marks argues the prosecutor's comments to the jury about forming premeditation "during the act itself" improperly eliminated the distinction between instantaneous development of intent to kill, a standard Marks assigns to second-degree intentional murder, and actual premeditation in first-degree murder cases. He says these statements prejudiced his right to a fair trial.

### Standard of Review

Appellate review of prosecutorial misconduct claims involves a two-step process. The appellate court first decides whether the comments were outside the wide latitude a prosecutor is allowed in discussing evidence and, therefore, improper. Second, if there was misconduct, the appellate court determines if reversal is required and must decide: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. *State v. Raskie*, 293 Kan. 906, 914, 269 P.3d 1268 (2012); *State v. Inkelaar*, 293 Kan. 414, 427, 264 P.3d 81 (2011). None of these three factors is individually controlling. *Inkelaar*, 293 Kan. at 427. If the defendant establishes misconduct of a constitutional magnitude, the State, as the party benefitting from the error, bears the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights. *Raskie*, 293 Kan. at 914.

*Discussion*

Our first step is to determine whether the prosecutor's comments were improper. And while a prosecutor has wide latitude in discussing evidence, the remarks must accurately reflect that evidence, accurately state the law, and cannot be intended to inflame the passions or prejudices of the jury or divert the jury from its duty to decide the case based on the evidence and controlling law. 293 Kan. at 917 (citing *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 [2004]). The alleged prosecutorial misconduct occurred when the prosecutor stated:

"If you don't want to consider evidence from before October 11th, then consider . . . the way she died that day. Eight times. That's not an accident, people. Eight times. She gets it here (indicating) and goes through into the top part of her arm. The doctor said her arm's like this (indicating), goes all the way through and you've got to pull that out and that's just one time, just one time. Then you've got to make the decision to do it again a second time. She's cut on her left hand. Gotta make the decision to do a third time. He cuts her again up in here (indicating). It goes through her arm again, all the way through. It goes through the skin here, the tissue and comes out the other end, then you've got to pull it out too, gotta pull it right back out. That's three. Then you've got to make a choice to do it a fourth time. Right here (indicating), plunge it in, pull it out. Got to do it a fifth time right in here (indicating), move your arm toward her again, pull it back. A sixth time right here (indicating). Again, you're choosing to make that motion. You're thinking about it, it's not accidental, you're not flailing it around. You're connecting right here by her heart (indicating). Then you've got to choose to do it a [seventh] time right here (indicating), the one that kills her, right in the chest to the hilt that one. Think about the effort to push that through, to go through in between two ribs, cut that right ventricle of her heart, to the hilt and then pulling it out and that's a conscious choice. That's a directed movement. That is not an accident. You pull it back out and then you do it one more time, the eighth time on the back of her neck which, ladies and gentlemen, she's facing him the whole time. . . .

. . . .

". . . Focusing on only that day, that's not considering all the evidence and that's what [defense counsel] wants you to do is focus on just that day. . . .

"However, if you do that, it still leads us to the same answer because that is *intent can be formed during the act itself*. It can be at some point formed—at some point he made a choice he was going to kill her that day. Eight stab wounds, that tells you what he was thinking right there. There's nothing that can tell you better than that." (Emphasis added.)

Marks argues it was a misstatement to claim premeditation could have been formed "during the act itself" in the time it took to stab her eight times. He asks us to find the prosecutor's statement that "intent can be formed during the act itself" is the same as incorrectly suggesting that premeditation may be formed instantaneously. Marks also argues the prosecutor misstated the evidence because there was nothing indicating Marks stopped and contemplated each stab before it occurred.

In *State v. Warledo*, 286 Kan. 927, 947, 190 P.3d 937 (2008), a case involving the repeated stomping on the victim as she lay on her kitchen floor, the prosecutor said during closing:

" 'Premeditation can be formed between the first and second stomps, between the second and third stomps, at any point during the stomping (attorney stomping). Okay. The stomping, what is his desire? To kill his mother. Ultimately it boils down to what's going on in the defendant's brain when he's stomping his mother to death. 15 stomps.' "

And on rebuttal the prosecutor further stated:

" 'What we're saying is as he stomped, as he knocked her down, he had time to think. As he kicked her in the head, he had time to think. As he stomped on her, he had time to think. Again, time to think and again, time to think and if that's not enough, ladies and gentlemen, you hear him on the tape walk away and then come back (attorney stomping) in between saying things. Again he stomped. He came back and then stomped again. Do you think he had time enough to think?' "

While acknowledging some prior decisions holding that premeditation cannot be formed instantaneously, the *Warledo* court also recognized that multiple blows may afford the defendant an opportunity to think about what he or she was doing, and that the infliction of additional blows once the victim was already helpless could show premeditation. Accordingly, the statement in that case was found to be consistent with PIK instructions and Kansas precedent because the comments merely informed the jury that the defendant could have developed the plan to commit murder once the fight started, as evidenced by the number of stomps and the 911 tape recording of Warledo telling the victim she would die. 286 Kan. at 950.

Similarly, in *State v. Anthony*, 282 Kan. 201, 145 P.3d 1 (2006), a case in which the victim was beaten repeatedly with an object, we held it was not misconduct when the prosecutor stated:

" 'And if you think about it, the two blows that actually killed David Carrington had to occur at some point, they may have occurred last and David Carrington went to the ground, but if they came last, then there is [*sic*] at least five blows before them. This person is thinking about what they are doing. They know what they are doing. If those two blows came first, then David Carrington is unconscious, defenseless on the ground, and this person continues to beat him at least five more times. That's premeditation.' " 282 Kan. at 208.

The *Anthony* court concluded that the prosecutor's remarks simply pointed out that the number and order of blows could have given the defendant the opportunity to think about what he was doing, and that inflicting additional blows after the victim was rendered helpless could constitute premeditation. 282 Kan. at 209.

In contrast, our decision in *State v. Hall*, 292 Kan. 841, 257 P.3d 272 (2011), a case involving a victim killed by a rapidly fired gun, demonstrates when a prosecutor's statement regarding the formation of premeditation *is* a misstatement. In *Hall*, there was no evidence of interaction between Hall and the victim prior to the shooting. Moreover, the evidence showed Hall fired three more shots in rapid succession. The prosecutor argued that Hall could have formed premeditation after the first trigger pull because he shot four times. We found it was error to argue that premeditation could be formed after the first trigger pull because it suggested that premeditation could be formed instantaneously—a notion we have rejected. 292 Kan. at 852.

The clear difference between *Hall* on the one hand, and *Warledo* and *Anthony* on the other, is that in *Hall*, the homicidal acts occurred in such rapid succession—the time between the first trigger pull and the final trigger pull—that we determined the time frame was essentially instantaneous. *Hall*, 292 Kan. at 852. In *Warledo* and *Anthony*, the evidence indicated a sufficient period between the beginning of the altercation and the last stomp or blow for the defendant to form premeditation before the ultimate homicidal act, yet during the same period of physical violence.

Marks' case is more analogous to *Warledo* and *Anthony* than it is to *Hall* because stabbing someone with a knife eight times is not instantaneous like rapid gunfire. And if the jury believed the coroner's testimony that Rozeta was likely stabbed through the driver's side window because the wounds were on her left side, then that offered additional moments to form premeditation.

But it is unclear from the prosecutor's remarks what was meant by "during the act itself." And without that clarity, we conclude that the prosecutor confused the formation of premeditation from what was instructed given the particular fact pattern in this case and the conflict in the evidence. We need not decide, however, whether this would be sufficient to constitute prosecutorial error by itself because another factor adds to our analysis.

Marks notes that the deputy coroner did not testify how quickly the stabbings occurred, though he did say the fatal stab wound would not have killed Rozeta instantly. The coroner labeled the stab wounds A, B, C, etc., to keep track of them but made clear these labels were arbitrary and did not indicate the order in which the stabs occurred. But the prosecutor nevertheless discussed what she believed was the actual sequence of the wounds and did so without medical evidence to support the argument. We hold that within the context of the evidence, the prosecutor's variance from the language in the instructions given to the jury, coupled with her remarks regarding the sequencing of the stab wounds, crossed the line into prosecutorial misconduct. With this holding we must next determine whether the error requires reversal.

We consider three factors in determining whether a prosecutor's misstatement constitutes plain error requiring reversal: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the error affected the defendant's substantial rights, meaning the error affected the trial's outcome. *Hall*, 292 Kan. 841, Syl. ¶ 14. The State, as the party benefitting from this error, bears the burden of demonstrating beyond a reasonable doubt that the error did not affect the trial's outcome in light of the entire record. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

At the outset, we find no evidence suggesting the prosecutor's conduct was gross and flagrant or exhibited ill will. In addition, we hold that the State has met its burden to show beyond a reasonable doubt that the conduct did not affect the trial's outcome because the State presented more than sufficient evidence of premeditation.

The State correctly points out a list of factors this court has approved when considering whether there was premeditation, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. See *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011); see also *Hall*, 292 Kan. at 854-56 (misstatement not reversible error where other evidence at trial showed premeditation). Not all factors must be present before premeditation can be inferred. See *State v. Morton*, 277 Kan. 575, 581-83, 86 P.3d 535 (2004) (evidence to support second and third factors sufficient in finding premeditation).

In Marks' case, the State presented sufficient evidence of premeditation under two different theories. The first was that Marks premeditated Rozeta's murder before the stabbing occurred. This was demonstrated at trial by the substantial evidence showing threatening texts and phone calls to Rozeta while she was visiting her friend in Tennessee, just days before the stabbing, including a text from Marks in which he told Rozeta she was "dead" when she returned.

Under the second theory, the State presented evidence that Marks formed premeditation to kill Rozeta between the eight stabs. Both the deputy coroner and Marks said the weapon used was a knife, which is a deadly weapon. And after the killing, Marks made numerous phone calls to friends and family members, including telling Williams' husband, "[S]ee what you made me do to that bitch?" And the fact that the car and knife were never recovered is indicative of a plan to hide evidence. When asked at trial what happened to the car, Marks said only that he did not know but remembered what street he left it on and that he took the key with

him when he got out of it. See *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 (2002) (premeditation inferred when evidence showed, among other things, defendant removed the license plate on his car before driving to victim's home). Finally, there were multiple stab wounds to Rozeta's body, including four in her chest.

We note also that the jury asked the court for a definition of "instantaneous" and whether the gap of time between a person's decision to act and the actual act is sufficient for premeditation. The dissent contends this question shows that the jury did not understand the meaning of premeditation. But the jury was instructed that premeditation means "to have thought over the matter beforehand . . . to have formed the design or intent to kill before the act." This definition squares with the State's first theory, which was that Marks premeditated Rozeta's murder while she was away in Tennessee.

Looking at the record as a whole, the trial's outcome would not be different if the misstatements were omitted. There was sufficient evidence showing a strong inference that Rozeta's stabbing was premeditated. And the jury was properly instructed on the law regarding premeditation and was also instructed that arguments of counsel were not evidence. As a result, the prosecutor's misstatements here do not warrant reversal.

## MOTION IN LIMINE

Marks next argues it was prejudicial error for the district court to deny his motion in limine to exclude evidence that Rozeta filed for divorce shortly before her death. In that motion, Marks argued that because there was no evidence he actually knew about the filing, the evidence was irrelevant to the issue of motive. Marks further argued that even if the evidence was relevant, its probative value was substantially outweighed by its prejudicial impact. Marks eventually lodged a continuing objection to evidence discussing the divorce filing.

### Standard of Review

When the admission or exclusion of evidence is challenged on appeal, the first inquiry is relevance. *State v. McMullen*, 290 Kan.

1, 7, 221 P.3d 92 (2009). Evidence is relevant when it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). This encompasses whether the evidence is probative and whether it is material. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 [2009]); *State v. Henson*, 287 Kan. 574, 578 197 P.3d 456 (2008). Probative evidence furnishes, establishes, or contributes toward proof. *Martinez*, 290 Kan. at 1009. The decision as to whether evidence is probative is reviewed for abuse of discretion. *Dixon*, 289 Kan. at 69.

Material evidence is that which tends to establish a fact that is at issue and is significant under the substantive law of the case. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). The determination whether evidence is material is reviewed under a de novo standard. *Martinez*, 290 Kan. at 1009.

If relevance is established, the evidentiary rules governing admission or exclusion of evidence are applied as a matter of law or in the exercise of judicial discretion, depending on the applicable rule. If the adequacy of the legal basis is questioned, we review the issue de novo. 290 Kan. at 1009 (citing *Dixon*, 289 Kan. at 70); *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006).

*Discussion*

The evidence of Rozeta's divorce filing was both probative and material. The State produced numerous text messages from Marks to Rozeta asking her to "tell the truth[]" about whether she was really getting a divorce. It also produced text messages from Rozeta to her friend Williams that said, "He dont believe that i'm getting a divorce. Keep begging PLEASE DONT[.] GIVE ME ANOTHER CHANCE." This permits a reasonable conclusion that Marks knew Rozeta had filed for divorce.

In addition, Rozeta's divorce filing was material in that it tended to establish Mark's motive and intent to commit murder. See *State v. Hughes*, 286 Kan. 1010, 1022, 191 P.3d 268 (2008) (Although motive is not an element of murder, the State may nevertheless admit evidence of motive to explain why the defendant may have committed the crime.); *State v. Drach*, 268 Kan. 636, 649, 1 P.3d

864 (2000) (Evidence of marital discord is competent as bearing on a spouse defendant's motive and intent.).

When Rozeta returned home from Tennessee, the text messages exchanged between her and Williams, as well as between Rozeta and Marks, support a finding that Marks learned of the divorce filing. Accordingly, evidence of the divorce filing would tend to establish motive and intent—both of which were at issue and significant under the substantive law applicable to the crime. See K.S.A. 21-3401(a)(1); *Hughes*, 286 Kan. at 1022. For these reasons, we hold that the evidence of Rozeta's divorce filing was relevant.

Marks argues next that even if the evidence of the divorce filing was relevant and otherwise admissible, it still should have been excluded because it was far more prejudicial than probative. This argument is similarly grounded in Marks' contention that there was no evidence he knew Rozeta had filed for divorce.

Kansas law favors the admission of relevant evidence. Generally, all relevant evidence is admissible, unless excluded by statute. K.S.A. 60-407(f); *State v. Miller*, 284 Kan. 682, 690, 163 P.3d 267 (2007). And it is within a trial court's discretion whether to exclude evidence if its probative value is substantially outweighed by the risk of unfair prejudice. K.S.A. 60-445; *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010); see also *State v. Leitner*, 272 Kan. 398, 415, 34 P.3d 42 (2001) (citing *State v. Davis*, 213 Kan. 54, 57, 515 P.2d 802 [1973]) (discussing statute's application to probative versus prejudicial). A district court abuses its discretion when its action is: (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Phillips*, 295 Kan. 929, Syl. ¶ 10, 287 P.3d 245 (2012).

Along with the telephone calls, text messages, voicemails, and other evidence, Rozeta's divorce filing showed the couple had a turbulent marriage, with an escalating pattern of threats and violence. Evidence that Marks seemed to know about the filing was

sufficiently probative to explain his intent to kill Rozeta along with a motive for doing so. Moreover, the prejudicial effect, if any, was minimal in light of all the evidence admitted.

Having concluded that the evidence of Rozeta's divorce filing was relevant and more probative than prejudicial, we hold that the district court did not abuse its discretion in denying the motion in limine and admitting testimony regarding the divorce filing.

### WYANDOTTE DISTRICT ATTORNEY'S OPEN FILE POLICY

Marks next argues the open file policy of the Wyandotte County District Attorney's Office for discovery in criminal cases violates K.S.A. 22-3212 and K.S.A. 22-3213, which govern discovery, demands for production, and the production of witness statements. Marks claims these statutes compel the State to provide him personal copies of discovery. He argues further that because he was not provided with these copies, the State violated his constitutional right to assist in his defense.

In the district court, Marks filed a motion to produce copies of witness statements taken from those who testified at the preliminary hearing, along with scientific test results, cell phone records, photographs, video/audio tapes, voicemails or other recordings, testimony transcripts of the defendant or anyone else, all exhibits the State intended to use at trial, his criminal record, the criminal record of all witnesses, and all exculpatory evidence. This motion did not reference any authority for the production and did not specify that it sought additional copies for Marks' personal use—only that copies were requested "for [the] defendant."

In its written answer to Marks' discovery motion, the State explained its open file policy as follows:

"The Wyandotte County District Attorney's Office has an open file policy. The entire case file is routinely provided to defense counsel prior to preliminary hearing. This policy allows defense counsel to obtain the case file earlier than contemplated by the discovery statute. This policy allows defense counsel to obtain parts of the case file that may not ever be discoverable pursuant to the discovery statute. The policy is contingent upon the file not being provided to the defendant personally. There are no stipulations against the defendant being able to view the case file in person, with his or her attorney."

The State's response explained that its goal was to protect "sensitive" personal identification information of various witnesses, reasoning that a defendant's access to this material could result in financial and personal safety risks to witnesses.

At a hearing on the motion, the district court denied Marks' request, articulating that defense counsel had been provided a copy of the district attorney's entire discovery file and that Marks was free to review that discovery with counsel and take notes. The district court also noted the open file policy was "more generous" than the statute requires, though it did not explain which discovery statute it was referring to.

Marks challenges the district court's decision through both a brief filed by his appellate counsel and one Marks submitted pro se. He frames the issue pro se as a right to "review or study" the State's discovery. But the district court's decision addressed whether Marks could review discovery with his attorney, and this was confirmed with Marks' counsel. There is no claim this review did not occur. With the issue raised pro se resolved in Marks' favor by the district court, our analysis focuses on counsel's arguments regarding whether Marks was entitled to personal copies.

*Standard of Review*

The claim that Marks was entitled to personal copies of certain discovery under K.S.A. 22-3212 and K.S.A. 22-3213 raises a question of statutory interpretation. This is a question of law over which appellate courts have unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

When interpreting a statute, an appellate court's first task is to ascertain legislative intent through an analysis of the language employed, giving ordinary words their ordinary meaning. *State v. Coman*, 294 Kan. 84, 92, 273 P.3d 701 (2012). When a statute is plain and unambiguous, we do not attempt to determine the intent behind it. 294 Kan. at 92. As a general rule, criminal statutes must be strictly construed so that any reasonable doubt about the meaning is decided in favor of the accused. 294 Kan. at 96. But this is subordinate to the rule that judicial interpretation must be reasonable and sensible to achieve legislative intent. If the statute's lan-

guage or text is unclear or ambiguous, the appellate court uses canons of construction or legislative history to construe the legislature's intent. *State v. Trautloff*, 289 Kan. 793, 796-97, 217 P.3d 15 (2009).

## Discussion

At the time of Marks' discovery request, K.S.A. 22-3212 provided in pertinent part:

"(a) Upon request, the prosecuting attorney shall permit *the defendant* to inspect and copy or photograph the following, if relevant: (1) Written or recorded statements or confessions made by the defendant, or copies thereof, which are or have been in the possession, custody or control of the prosecution, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; (2) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; (3) recorded testimony of the defendant before a grand jury or at an inquisition; and (4) memoranda of any oral confession made by the defendant and a list of the witnesses to such confession, the existence of which is known, or by the exercise of due diligence may become known to the prosecuting attorney.

"(b) Upon request, the prosecuting attorney shall permit *the defendant* to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which are or have been within the possession, custody or control of the prosecution, and which are material to the case and will not place an unreasonable burden upon the prosecution." (Emphasis added.)

K.S.A. 22-3212(d) provided at the time of the discovery motion that "[t]he prosecuting attorney and *the defendant* shall cooperate in discovery and reach agreement on the time, place and manner of making the discovery and inspection permitted, so as to avoid the necessity for court intervention." (Emphasis added.) And K.S.A. 22-3212(e) provided for district court oversight regarding the extent, manner, and method of discovery, stating: "Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted or deferred or make such other order as is appropriate." K.S.A. 22-3212(e). That subsection then establishes a procedure for that review, which was not followed in this case. See K.S.A. 22-3212(e). Notably, the legislature

amended K.S.A. 22-3212 since Marks' trial, but the parties do not argue those amendments impact our analysis. See L. 2012, ch. 143, sec. 1; L. 2011, ch. 30, sec. 125; L. 2010, ch. 30, sec. 1..

As for K.S.A. 22-3213, which is unchanged, it provides that after a witness at a preliminary hearing or trial testifies on direct examination, the court shall, on the defendant's motion, order the prosecution to produce any witness statement in the prosecution's possession relating to the subject matter on which that witness testified. And as to any such statement, "the court shall order it to be delivered *directly to the defendant for his examination and use.*" (Emphasis added.) K.S.A. 22-3213(1)-(2).

Neither K.S.A. 22-3212 nor K.S.A. 22-3213 leave room for interpretation as to who "the defendant" is because the meaning can be readily ascertained by the plain language—the defendant is the person who is charged with the crime. And this interpretation is bolstered by noting the contrast in the statutes between the manner of production to the respective parties. One provision requires that when the defendant must produce discovery to the prosecution that discovery is to be produced for *"the attorney* for the prosecution" to inspect and copy. (Emphasis added.) K.S.A. 22-3212(c).

But a notion that referencing "the defendant" universally encompasses defense counsel is dispelled by the language in a similar statute, K.S.A. 22-2302(2), which concerns production of the affidavit used in support of probable cause. It states:

"Affidavits or sworn testimony in support of the probable cause requirement of this section shall not be made available for examination without a written order of the court, *except that such affidavits or testimony when requested shall be made available to the defendant or the defendant's counsel for such disposition as either may desire.*" (Emphasis added.)

While K.S.A. 22-2302(2) is not at issue, its language indicates the legislature recognized the difference between the defendant and defense counsel by explicitly stating that each is entitled to a copy of the affidavit. See also *State v. Thomas*, 273 Kan. 750, 754, 46 P.3d 543 (2002) ("trial court's ruling that a represented defendant can only have access to the documents [identified in K.S.A. 22-

2302(2)] through his or her counsel is illogical in light of the statutory language").

K.S.A. 22-3212 and K.S.A. 22-3213 unambiguously require disclosure to the defendant. The district court erred to the extent it held that K.S.A. 22-3212 and K.S.A. 22-3213 do not authorize a defendant to have personal copies of discovery and witness statements. We recognize the importance of protecting sensitive information, but we note K.S.A. 22-3212(e) provides a procedure for that very issue. The open file policy simply placed a larger bandaid over that problem than was necessary or permitted by statute. We must decide next whether that error was harmless.

If an error infringes upon a right guaranteed by the United States Constitution, we must be convinced beyond a reasonable doubt that the error did not affect the outcome in light of the entire record. *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). If the error does not infringe upon a constitutional right, we apply the harmless error analysis of K.S.A. 60-261 and K.S.A. 60-2105 to determine whether there is a reasonable probability that the error affected the trial's outcome. *State v. McCullough*, 293 Kan. 970, 981, 270 P.3d 1142 (2012). The State, as the party benefitting from the error, bears the burden of proof in either instance. 293 Kan. at 983.

Marks claims his inability to retain personal copies of discovery and witness statements infringed on his constitutional right to meaningfully participate in his own defense. He does not articulate how his participation was actually impeded when he otherwise had the opportunity to review the information with his attorney, nor does he cite any authority which would support his theory of constitutional infringement.

The Sixth Amendment to the United States Constitution guarantees in "all criminal prosecutions" that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The Kansas Constitution Bill of Rights, § 10, provides in pertinent part: "In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel . . . ." A criminal defendant is entitled to the "assistance of counsel" and, if indigent, the defendant may be appointed counsel, who is to represent the client, in-

form him or her fully of the crime charged and the possible penalty, and "fully and fairly represent the defendant" in the proceeding. K.S.A. 22-4503.

But, "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). A defendant's right to assistance in his or her defense does not translate to a constitutional right to personal copies of discovery, particularly when that discovery was already provided to his or her attorney. See *United States v. Shrake*, 515 F.3d 743, 745 (7th Cir. 2008) (defendants not constitutionally entitled to discovery; federal statute limiting pretrial discovery constitutional); *People v. Davison*, 292 Ill. App. 3d 981, 988, 227 Ill. Dec. 75, 686 N.E.2d 1231 (1997) (defendant has no constitutional right to read discovery materials; whether to provide personal copies of discovery to defendant is a matter left to trial counsel's discretion).

This court has previously declined to find a constitutional violation when a defendant claimed a discovery violation. See, *e.g.*, *State v. Deavers*, 252 Kan. 149, 158, 843 P.2d 695 (1992) (no constitutional violation when requested discovery files did not contain information that would have assisted the defense), *cert. denied* 508 U.S. 978 (1993). Marks' contention is similar to that made in *Deavers* because Marks has not made any viable argument regarding how his personal retention of discovery and witness statements would have assisted his defense. Stated another way, we are unable to discern how Marks' defense was or could have been impaired by the district court's error. In addition, the district court's order did not prevent Marks from reviewing and studying the discovery and witness statements. To the contrary, the district court instructed counsel to allow Marks to review the requested materials and confirmed that those instructions would be followed. Specifically, the record reflects:

"[The Court]: . . . [H]ere's what my ruling is going to be: Number one, that [defense counsel] can provide to Mr. Marks—can show Mr. Marks any document that he has in terms of discovery, that Mr. Marks can look at those documents, he can touch those documents and Mr. Marks can take any notes that he wants to from those documents in preparation for trial. But in terms of photocopying

those documents or otherwise leaving . . . the discovery documents with Mr. Marks in the jail after [defense counsel] has ceased a meeting, court is going to order that that is not going to be the case in this particular situation.

"So, Mr. Marks, you're going to have access to all those documents, you can take whatever notes that you feel is beneficial to you that you want to remember from those documents . . . ."

We are convinced that the district court's refusal to allow Marks to retain personal copies of discovery and witness statements did not affect a constitutional right. Accordingly, we apply the harmless error analysis of K.S.A. 60-261 and K.S.A. 60-2105 to determine whether there is a reasonable probability that the error affected the trial's outcome. *McCullough*, 293 Kan. at 981. And on that basis, we hold the error was harmless.

Marks' attorney was provided with discovery in accordance with the Wyandotte County District Attorney's open file policy, which, as the district court noted, is more generous than the discovery statutes require and arguably allows the defense to perform more thorough trial preparation. There is no allegation Marks' defense was compromised due to his inability to obtain copies of discovery or that counsel failed to review that discovery with Marks. Rather, Marks was permitted to review all discovery information and take notes if he chose to do so. Marks' counsel informed the court that he would allow Marks to review all the discovery information, and there is no suggestion that he did not do that. Finally, in viewing the entire record, we cannot discern any impact on the proceedings. Accordingly, we hold there is no reasonable probability the district court's error in interpreting K.S.A. 22-3212 and K.S.A. 22-3213 affected the trial's outcome.

## CUMULATIVE ERROR

Marks asserts that the cumulative error doctrine necessitates reversal. We have identified two errors—the prosecutor's misstatement about premeditation and the district court's interpretation of the discovery statutes, K.S.A. 22-3213 and K.S.A. 22-3212. The test for cumulative error is " 'whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect

rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" See *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010); *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

The identified errors do not overtake the strength of the evidence against Marks. The evidence of his guilt was overwhelming based in significant part on his own statements to Rozeta, friends, and family. There is no cumulative error.

Affirmed.

* * *

JOHNSON, J., dissenting: I respectfully dissent from the majority's decision on the prosecutorial misconduct issue relating to premeditation, in which the majority holds that the prosecutorial misconduct is not reversible error. I would reverse.

First, notwithstanding its majority view status in this State, I continue to reject the notion that a person can premeditate a murder while committing the murder. In my view, concurrent premeditation is an oxymoronic concept that obliterates the distinguishing feature of first-degree premeditated murder. See *State v. Appleby*, 289 Kan. 1017, 1074-75, 221 P.3d 525 (2009) (Johnson, J., concurring in part and dissenting in part) (premeditation contemplates that the matter be thought over before commencement of homicidal conduct); *State v. Warledo*, 286 Kan. 927, 956, 190 P.3d 937 (2008) (Johnson, J., concurring) (premeditation requires having thought the matter over beforehand; "beforehand" must mean prior to commencing the death-causing act).

More specifically in this case, allowing the prosecutor to argue that a premeditated intent to kill "can be formed during the act itself" directly contradicted the plain language of the jury instruction given in this case, which told the jury that premeditation means "to have formed the design or intent to kill *before the act*." (Emphasis added.) To me, arguing that the formation of an intent to kill *during* the act fulfills the legal requirement that the intent to kill must be formed *before* the act is unequivocally erroneous, regardless of the context.

Further, the instruction defining premeditation cautioned the jury that "the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." Consequently, the jury had to struggle with the nonsensically confusing task of how to equate "during" with "before," while excluding "instantaneous." It is not surprising, then, that the jurors in this case were apparently befuddled, as indicated by their request for a "reasonable definition of 'instantaneous' " and their question as to whether "if someone decides to act and then acts is that gap of time sufficient to declare pre-med?" The trial court answered the question by instructing the jury to re-read the instructional definition of premeditation but did not clarify that the jury could disregard the prosecutor's argument on how the jury was to apply that definition to the facts of this case. The majority's pointing out that one of the prosecutor's theories of premeditation may have comported with the plain language of the jury instruction does not answer the question of whether the jury was confused by the prosecutor's other theory of premeditation which directly contradicted the plain language of the premeditation instruction. I can have no confidence in a jury's conviction for premeditated murder when I have no confidence that the jury knew the meaning of "premeditated."

Next, I am not persuaded that *State v. Hall*, 292 Kan. 841, 257 P.3d 272 (2011), is distinguishable from *Warledo* and this case solely on the basis of the time necessary to complete the homicidal conduct, *i.e.*, that Hall could fire four successive shots from a handgun faster than Warledo could stomp his mother to death or Marks could stab his wife eight times. I submit that a human brain can form thoughts faster than the human body can translate those thoughts into action, and that Hall's finger would not have pulled the handgun's trigger the second, third, and fourth time without being told to do so by Hall's brain. I further submit that a person's thought process during an adrenaline-flooded, life-endangering crisis does not operate in the thoughtful, contemplative manner suggested by some of our prior cases. Here, for instance, the apparently random delivery of multiple stabs to nonvital locations on

the victim's extremities indicates extreme rage more than considered behavior.

Perhaps we should be guided by our double jeopardy jurisprudence, where we analyze multiplicity by first determining whether the convictions arise from the same conduct. See *State v. Schoonover*, 281 Kan. 453, Syl. ¶ 15, 133 P.3d 48 (2006). To determine whether a defendant's acts constituted unitary conduct, we look at such factors as whether the acts occur at the same time and at the same location; whether the acts were separated by an intervening event; and whether some of the conduct was motivated by a fresh impulse. 281 Kan. 453, Syl. ¶ 16. I submit that we would not have allowed Marks to be convicted of seven additional counts of aggravated battery for the nonfatal stab wounds because we would find an absence of a fresh impulse for the multiple acts occurring at the same time and the same place. Yet, the majority view would allow him to form a fresh intent during the incident, even where no fresh impulse exists. I find that logic untenable. The crime of premeditated murder should be reserved for killings that are calmly planned or designed prior to the commencement of the murderous act, *i.e.*, murder in cold blood, rather than applied to crimes of passion, regardless of the amount of time that may be consumed by the killer's rage.

Nevertheless, I do agree with the majority's determination that the prosecutor's narrative, giving a blow-by-blow description of the stabbing incident, was not supported by the actual evidence the State presented at trial. The prosecutor's story related that the defendant methodically and deliberately stabbed the victim five or six times in various locations on her arms and hands before delivering the fatal stab to the chest, followed by one last stab to the neck. The prosecutor repeatedly emphasized the obvious fact that the stabbing was not accidental; arbitrarily declared that the defendant was not "flailing [the knife] around"; and unjustifiably suggested that there was a pause between stabs which allowed the defendant to "make the decision to do it again." But the coroner did not establish the order in which the victim's stab wounds were inflicted or the rapidity or precision with which they were delivered. Thus, while the prosecutor's dramatization served nicely to

support the State's theory of concurrent premeditation, it impermissibly argued facts not in evidence. Obviously, the State's suggestion that Marks formed the intent to kill during the act of killing is not nearly so compelling if the fatal blow to the chest was the first stab he delivered. In that event, the killing would be more closely akin to "instantaneous," and the time it took to deliver the subsequent, superfluous, nonfatal stabs would only have permitted the formation of retroactive premeditation, which is even more ludicrous than concurrent premeditation.

But the bottom line is that, even if I were to surrender to the theory of concurrent premeditation, I could not excuse the prosecutor's arguing facts not in evidence in this case. This was not a slip of the tongue or an innocuous memory lapse. The prosecutor created her own scenario, unsupported by the facts, in order to present a better argument in support of the State's theory of the defendant's culpability for premeditation. Attempting to convict a person of a crime based on made-up facts is gross and flagrant conduct, if it is anything. Such conduct also has to suggest some level of ill will toward the defendant. I suspect that most, if not all, litigators wish they could manufacture better facts for closing argument, but they understand that justice does not permit that ploy.

Finally, I cannot view the evidence of premeditation in this case as so overwhelming as to render the error harmless. The majority contends that the State presented sufficient evidence of premeditation under two theories: (1) that Marks premeditated the murder before the act of killing, as evidenced by his threatening texts and telephone calls while the victim was in Tennessee; and (2) that "Marks formed premeditation to kill [the victim] between the eight stabs." The majority then points out that the definition of premeditation contained in the jury instructions—that the design or intent to kill must be formed before the act of killing—squares with the State's first theory, i.e., "that Marks premeditated [the victim's] murder while she was away in Tennessee." The majority then declares that "[t]here was sufficient evidence showing a strong inference that [the victim's] stabbing was premeditated." My disagreement with the majority's assessment of the strength of the

premeditation evidence is not as important as my disagreement with the evidentiary test that the majority apparently applies.

As I read the majority opinion, it addresses a sufficiency of the evidence question, *i.e.*, whether a rational jury could find the existence of the premeditation element, beyond a reasonable doubt, from the evidence presented at trial and from all reasonable inferences that can be drawn from that evidence. But that is not the question presented here. We are considering the third factor of the second step of the prosecutorial misconduct analysis: " 'whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors.' " *State v. McCaslin,* 291 Kan. 697, 715-16, 245 P.3d 1030 (2011) (quoting *State v. Bryant,* 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 [2008]).

The evidence that the majority finds compelling on the first theory—the threats sent to Tennessee—is neither direct nor overwhelming. The most that can be read into the Tennessee texts is that Marks was thinking about killing his wife when she returned from Tennessee. That did not happen. In fact, after the victim returned from Tennessee, she told her Tennessee friend that Marks was begging her not to divorce him and to give him another chance. There has to be some causal connection between the premeditation and the act of killing. In other words, "the matter" which must be thought over beforehand is the act of murder that actually occurred, not some general homicidal thoughts in the past or some earlier design or plan to kill that was abandoned in favor of reconciliation.

Granted, evidence that Marks had previously verbalized a threat to kill his wife may support some inference that he once again premeditated murder specifically with respect to the stabbing incident. Moreover, that would be a jury question. But we can say that the evidence of premeditation of this particular killing is certainly not overwhelming, especially in the face of the testimony of the defendant's brother, who saw the defendant and victim just minutes before the stabbing. The brother described the couple as appearing "normal" at that time and getting along; the brother did not think the defendant was agitated or angry. The victim waited

in the car while the defendant picked up some tools at the brother's house, and the victim waived to the brother. The Tennessee friend corroborated that tranquility, opining that the victim sounded "fine" when the friend spoke to her just before the stabbing. The evidence that one moment the defendant and the victim are normal and getting along and the next moment the victim is staggering down the street with eight stab wounds is just as indicative of a sudden quarrel as a premeditated killing.

Further, the majority misdirects our inquiry by focusing on the State's first theory of premeditation upon which the majority found no prosecutorial misconduct. We should be looking at the impact of the prosecutor's misconduct which the majority found to be erroneous in this case, *i.e.*, arguing facts not in evidence to prove that the intent was formed during the act. The inquiry is whether that misconduct was likely to have had little weight in the minds of the jurors. That inquiry is simplified in this case by the jury's questions to the trial court, which make it abundantly clear that premeditation was weighing heavily on the jury's collective mind. But even without the jury questions, I could not declare harmlessness where the prosecutor told the jury a make-believe story to support a theory of premeditation that directly contradicted the plain language of the jury instruction definition of premeditation. I would reverse and give Marks a fair trial with a jury that is properly led to understand the concept of premeditation.

MORITZ, J., joins in the foregoing dissent.