NOT DESIGNATED FOR PUBLICATION

No. 122,333

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
D.J.B., D.B., D.D.B., D.L.B., and D.M.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wilson District Court; TOD MICHAEL DAVIS, magistrate judge. Opinion filed July 17, 2020. Affirmed.

*Brandon D. Cameron*, of Hines, Jones & Cameron LLC, of Erie, for appellant natural mother.

*Cole Hoffmeister*, of Emert Chubb Reynolds LLC, of Independence, for appellant natural father.

*Daylene Walls*, of Coffeyville, for appellee State of Kansas.

Before GARDNER, P.J., BRUNS and WARNER, JJ.

PER CURIAM: The district court adjudicated five children as children in need of the State's care, finding they lacked parental care, support, and control under K.S.A. 2019 Supp. 38-2202(d)(1) and (2). The children's natural parents appeal that decision, asking that we come to a different conclusion based on some of the testimony presented at the adjudication hearing. But though we recognize the evidence in this case was contested, it is not the role of an appellate court to reassess witnesses' credibility or reweigh the evidence. After carefully reviewing the parties' arguments and the record before us, we conclude there is sufficient evidence in the record to support the court's findings. Thus, we affirm.

1

On October 18, 2017, the State filed a Child in Need of Care (CINC) petition on behalf of D.J.B., D.B., D.D.B., D.L.B., and D.M.B, who then ranged in age from 13 to 2. The petition alleged the five children were without adequate parental care, control, or subsistence, not due solely to the lack of financial means of their parents, and were without the care or control necessary for their physical, mental, or emotional health. See K.S.A. 2019 Supp. 38-2202(d)(1), (2). The parents initially did not contest the State's petition, but several months later they successfully set aside their stipulations in order to challenge the adjudication proceedings.

The adjudication hearing was not held until June 2019. At the hearing, Stefanie Senf (a social worker for the Department of Children and Families [DCF]), the children's mother (Mother), and the children's maternal grandmother (Grandmother) were the only witnesses to testify. The testimony at the adjudication hearing, though often conflicting, presented the following history.

Social workers from DCF had been in frequent contact with the children's family since 2011. But the State's CINC petitions were based primarily on the reports of Senf, who had investigated the children's circumstances twice in the days before the petition was filed. Senf initiated her investigation after the county attorney received a report from Grandmother, who was concerned about the children's well-being. During that same time, D.J.B. (the oldest of the five children, then 13 years old) had been placed in protective custody for not attending school for at least two weeks; he was also facing felony charges in Montgomery County for his participation in several break-ins.

At the time of Senf's investigation, Father was serving a jail sanction for violating the terms of his probation by using methamphetamine and failing to meet with his mandated men's non-violence group. The family had been living in a trailer owned by

2

one of Father's friends, but once Father began serving his sanction, the four youngest children and Mother moved to Grandmother's house because they had nowhere else to go—that is, they were allegedly homeless. D.J.B. was apparently not residing at Grandmother's home; instead, he was staying between several different houses and had not been attending school for a number of weeks.

When Senf arrived at Grandmother's house, Mother was not present. Grandmother informed her that she did not know where Mother was; she had left early that morning and did not ask Grandmother to watch the children. According to Senf's affidavit and her testimony at the adjudication hearing, Grandmother reported that Mother had showed up on her doorstep with the children needing a place to stay. Grandmother claimed they did not have food and the youngest two children did not have diapers. At least one of the children informed Senf that the children were often hungry.

Senf also reported that Grandmother expressed concerns about Mother's mental health, substance abuse, and issues relating to domestic violence. Grandmother conceded that there had not been any recent domestic violence issues that she was personally aware of and did not know whether Mother was actually using drugs. But one of the children told Senf about seeing a glass tube with a burnt end and claimed to feel safer at Grandmother's house. Grandmother told Senf that during a recent argument between Grandmother and Mother, Mother had threatened to kill both herself and the children. At the adjudication hearing almost two years later, when asked if Mother had ever threatened to kill the children, Grandmother clarified: "Oh, no, no, no, no. Herself, yeah. And—well, she asked me . . . What do you want me to do? Do you want me to kill myself and my children too? That's exactly what she . . . said."

Grandmother's other reported concern was that Mother was often absent and was unable to care for the children, frequently leaving them unsupervised. Grandmother told the social worker that Mother was rarely at the home and would come and go as she

3

pleased without warning, often leaving the children alone. And because Grandmother was not the children's legal guardian, she did not have the legal authority to care for the children—i.e., she could not take them out of school or authorize medical care without Mother or Father. Although the social worker reported the children appeared healthy during her visit, she observed that the two youngest children (who were approximately two and three years old) had their heads partially shaved; she was informed that one of these two children had gotten ahold of an electric razor while they had been left unattended and had given them both haircuts. Senf testified that Grandmother told the social worker she did not want Mother living with her or with the children.

While much of Senf's investigation was based on information Grandmother told the social worker in October 2017, Grandmother's account was substantially different at the June 2019 adjudication hearing. At the hearing, Grandmother claimed not to remember Senf ever coming to the house to speak with her and check on the children. Grandmother testified that she had reported the children's situation because she was "angry" at Mother and "stressed out" over D.J.B.'s legal trouble. She denied saying she did not want Mother staying in her home. And she stated that Mother was always around while she and the children stayed with her, except when she went to the grocery store or briefly visited friends. Grandmother also claimed—despite her prior assertions to the contrary—that she believed Mother was capable of taking care of the children and providing for them. And when she was asked to confirm the various concerns for the children she had described to the social worker, Grandmother provided evasive responses such as: "I might think that," "I probably did," and "I might have."

The State questioned Grandmother about why her testimony was so different from what she had previously told the DCF social worker, specifically asking if anyone had encouraged her to change her testimony; Grandmother replied: "I have a mind of my own." She stated that she may have made things up when she talked to Senf because she was mad at Mother and they had just had an argument. But Grandmother admitted that

4

Senf's recollection of their conversations was likely more accurate than her own because the social worker had taken notes and drafted a report. She also indicated she had wanted the children to live with her, and she was unhappy that the children had been placed in foster care instead.

For her part, Mother testified that she believed Grandmother had either made up or exaggerated the accusations about the children's situation because she wanted custody of the children. Mother also stated that she and the children were not homeless, though she could not recall the exact details of where they had been living or when. Mother stated that she came to Grandmother's house with a few diapers for the younger children, but that was enough since they were potty training. Mother testified she had never left the children alone for more than two hours and—despite having no job and not receiving any governmental assistance—believed she was able to adequately take care of the children's needs. Overall, Mother denied the State's allegations and claimed Grandmother's statements were untrue.

The district court was also presented with evidence regarding Mother's and Father's actions during the 20 months the CINC petition was pending. Initially, Mother and Father both entered no-contest stipulations to the allegations in the petition; those stipulations remained in place for 9 and 10 months, respectively. But after the parents set aside their stipulations and challenged the adjudication in October and November 2018, they wholly failed to comply with the court-ordered case plan. Neither submitted to urinalysis checks or signed required consent forms; neither attempted to visit, communicate with, or provide support to their children in the months before the adjudication hearing. Though Father did not testify, Father's attorney indicated that the reason for the parents' noncompliance was that they believed the children had been improperly taken from Mother and Father in the first place, so they should not have to comply with the court's orders.

After hearing the testimony and considering the evidence before it, the district court adjudicated D.J.B., D.B., D.D.B., D.L.B., and D.M.B. as children in need of care under K.S.A. 2019 Supp. 38-2202(d)(1) and (2). In reaching this conclusion, the court expressly found Grandmother and Mother had not provided credible testimony; the court found Senf's account to be credible and reliable. It explained:

"I do think the State has met its burden, and I'm basing that on the testimony of [Senf] as well as the testimony of both the grandmother and the mom. Piecing that all together, there are times when they contradicted each other, but there are also statements that they all made that meshed together.

. . . .

". . . I think the parents' conduct up to today from the time the temporary— temporary custody hearing in and of itself would constitute grounds for an adjudication hearing.

" . . . [T]he parents have had no contact—because their—of their own conduct, the parents have had no contact with these kids for—I don't recall now for how long—for a fairly substantial period of time.

"But based on the evidence presented today—and I think that's—well, based on the evidence today, I do find that the State has met its burden of proof. I am going to adjudicate the children to be children in need of care."

Mother and Father now appeal that decision.

DISCUSSION

CINC actions, brought under the revised Kansas Code for Care of Children, K.S.A. 2019 Supp. 38-2201 et seq., stem from the State's interest in protecting the safety and welfare of children within its jurisdiction. See K.S.A. 2019 Supp. 38-2201(a) (proceedings under the Code "deemed to be pursuant to the parental power of the state"); and K.S.A. 2019 Supp. 38-2201(b)(1) ("safety and welfare of a child to be paramount in all proceedings under the code"). A CINC adjudication is one step in the State's protective process and may be followed by attempts to reunite the children and parents or

6

by a more permanent separation or termination of parental rights. See K.S.A. 2019 Supp. 38-2251; K.S.A. 2019 Supp. 38-2269. A parent may appeal the adjudication, as Mother and Father have done here. See K.S.A. 2019 Supp. 38-2273(a).

The district court found that D.J.B., D.B., D.D.B., D.L.B., and D.M.B. were children in need of care under K.S.A. 2019 Supp. 38-2202(d)(1) and (2). Under these provisions, the State was required to prove by clear and convincing evidence that the children were "without adequate parental care, control or subsistence" for a reason "not due solely to the lack of [the parents'] financial means" and that they were "without the care or control necessary for [their] physical, mental or emotional health." K.S.A. 2019 Supp. 38-2202(d)(1), (2); K.S.A. 2019 Supp. 38-2250; *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). When reviewing such a determination, an appellate court must consider whether there was sufficient evidence presented from which the court could have concluded it was highly probable that the children were children in need of the State's care under the statute. 286 Kan. at 705. In doing so, we view the evidence in the light most favorable to the prevailing party. We do not reweigh conflicting evidence or reassess the credibility of witnesses; instead, we rely on the fact-finder—who was present to observe the witnesses' demeanor and hear their testimony—for those judgments. 286 Kan. at 705.

Mother and Father assert that many of the social worker's findings and reports were contradicted by the testimony of Mother and Grandmother, and therefore the State could not prove by clear and convincing evidence that the children were without the adequate care and control required by law. But while there was conflicting testimony presented at the adjudication hearing, the district court found Senf's testimony and report provided a credible account of the facts. We do not reweigh the evidence and do not—in fact, cannot—reassess witnesses' credibility.

7

When viewed in the light most favorable to the State, there is sufficient evidence to support the district court's findings. In particular:

- Mother and the children moved in with Grandmother because they were homeless.

- The two youngest children did not have diapers when they arrived at Grandmother's house.

- Mother was not able to provide the children with adequate food, and one child stated they often went hungry.

- Mother frequently left without warning and left the children unattended.

- Grandmother—who was frequently left to care for the children—did not have the legal authority to authorize their medical care or pick them up from school if something was amiss.

- One of the children reported finding a glass pipe with a burnt end inside their house.

- Father was in jail for drug use and other probation violations and was unable to provide for the children in October 2017.

- Mother and Father both had a history of substance abuse, and Grandmother was concerned that Mother was potentially using drugs again.

- The oldest of the five children was truant from school and was facing felony charges for his alleged participation in burglaries.

- The youngest two children had partially shaved their heads when they had been left unattended and had found an electric razor.

In their brief, the parents point out that Mother and Grandmother disputed many of these allegations. But the record, when viewed in the light most favorable to the State, reasonably supports the conclusion that D.J.B., D.B., D.D.B., D.L.B., and D.M.B. were children in need of care under K.S.A. 2019 Supp. 38-2202(d)(1) and (2).

Mother and Father nevertheless assert that several of the social worker's statements about the children's situation were unconfirmed and fail to show the children were without adequate parental care, control, or subsistence or without the care and control necessary for their physical, mental, and emotional health. We disagree.

For example, the parents assert that there was no evidence to substantiate Senf's report that Grandmother had indicated Mother threatened to kill herself or the children. But while there was no evidence presented at the adjudication hearing that Mother *actually* intended to act on her threats—or did act on her threats—to harm either herself or her children, the court heard evidence from both Senf and Grandmother indicating Mother had made that threat during an argument. There is no requirement that a child be actually harmed before "addressing a child that is clearly at risk for harm." *In re L.C.*, No. 120,124, 2019 WL 1976471, at *4 (Kan. App. 2019) (unpublished opinion). Mother's statement to Grandmother, on top of the other evidence presented, warranted the State's concerns for the safety of the children. When taken as a whole, the evidence supports the district court's conclusion that the children were children in need of care.

Mother and Father also argue the court should not have considered DCF's historical involvement with their family, noting DCF's reports contained information dating back to 2011, before the youngest two children were born. But the district court based its CINC determination on Senf's testimony regarding the October 2017 events and the parents' conduct since that time—not any previous incidents or allegations. Thus, the parents' allegations are misplaced.

Finally, Mother and Father contend that the district court should not have examined their actions between the time the petition was filed and the adjudication hearing in making its ruling. We observe that multiple panels of this court have determined that Kansas law does not limit the evidence in a CINC adjudication to evidence obtained before a petition was filed. E.g., *In re D.H.*, 57 Kan. App. 2d 421, 429, 453 P.3d 870 (2019), *rev. denied* 311 Kan. __ (February 27, 2020); *In re B.G.*, No. 109,513, 2013 WL 4404574, at *5 (Kan. App. 2013) (unpublished opinion); *In re A.M.*, No. 108,102, 2013 WL 518019, at *3-4 (Kan. App.) (unpublished decision), *rev. denied* 297 Kan. 1245 (2013). While we are not bound by these decisions, we come to a similar conclusion here.

In Kansas, we start with the presumption that "[a]ll relevant evidence is admissible unless it is otherwise precluded by statute, constitutional provision, or court decision." *State v. Baker*, 287 Kan. 345, 363, 197 P.3d 421 (2008); see K.S.A. 60-407(f). Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevant evidence must be both probative and material. *State v. Marks*, 297 Kan. 131, 142, 298 P.3d 1102 (2013). Evidence is probative when it "furnishes, establishes, or contributes towards proof." 297 Kan. at 142. And evidence is material when it "tends to establish a fact that is at issue and is significant under the substantive law of the case." 297 Kan. at 142. Appellate courts review materiality of evidence de novo and its probative value for an abuse of discretion. 297 Kan. at 142.

As this court explained in *D.H.*, nothing in K.S.A. 2019 Supp. 38-2202(d) limits the temporal scope of evidence that can be presented in a CINC adjudication proceeding. The statute's only time-based limitation is that the minor in question must be "a person less than 18 years of age at the time of filing of the petition." K.S.A. 2019 Supp. 38-2202(d); *In re D.H.*, 57 Kan. App. 2d at 428. There is no question the five children here, who were between the ages of 13 and 2, fall into that category. The two statutory provisions the district court found applicable—K.S.A. 2019 Supp. 38-2202 (d)(1) and

(2)—consider whether each child "is without" parental care or control. Contrary to the parents' arguments, nothing in that language limits the temporal scope of the evidence that could be considered in this CINC adjudication. And the fact that Mother and Father made no efforts to follow the case plan so they could visit their children and had provided no support to their children at the time of the hearing—whatever their claimed reason for this noncompliance—supports the district court's finding that D.J.B., D.B., D.D.B., D.L.B., and D.M.B. were without the required parental care and control. See *In re C.D.W.*, 24 Kan. App. 2d 456, 458, 946 P.2d 100 (1997).

There was sufficient evidence presented in the CINC adjudication to support the district court's findings that D.J.B., D.B., D.D.B., D.L.B., and D.M.B were children in need of care under K.S.A. 2019 Supp. 38-2202(d)(1) and (2).

Affirmed.