NOT DESIGNATED FOR PUBLICATION

No. 121,254

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of G.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD A. MACIAS, judge. Opinion filed May 15, 2020.
Affirmed.

*N. Trip Shawver*, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., WARNER, J., and ROBERT J. WONNELL, District Judge, assigned.

PER CURIAM: Since he was a baby, G.M. has been treated for a host of medical conditions. These involved several invasive surgeries and required G.M. to take multiple prescription medications with serious side effects. By the time he was 11 years old, G.M. had not attended school for over a year and appeared to be losing his mobility. These various treatments, procedures, and medications were provided based on reports of symptoms by—and often at the insistence of—G.M.'s mother, sometimes contrary to the advice of G.M.'s doctors. In February 2018, medical professionals reported concerns that G.M. was the victim of caregiver-fabricated illness—that is, that the treatment, procedures, and medication G.M. received were unnecessary because the symptoms his mother reported could not be objectively verified. The providers were also concerned the multiple overlapping treatments he underwent were exacerbating his conditions.

1

After hearing several days of evidence, the district court adjudicated G.M. a child in need of care. G.M.'s mother now appeals that adjudication. Because there is sufficient evidence in the record to support the court's findings, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Though he is young, G.M. has an extensive and complicated medical history. Beginning when he was less than two years old, G.M.'s mother (Mother) reported symptoms to his medical providers that led to diagnoses of—and treatment for—multiple serious conditions, including global developmental delay (later classified as autism with intellectual impairment), seizures, migraines, somnolence (excessive tiredness and sleeping), sleep apnea, cyclic vomiting, eosinophilic gastroenteritis, difficulty urinating, and failure to thrive. In February 2018, the State filed a Child in Need of Care (CINC) petition on behalf of G.M., who was then 11 years old, alleging he was the victim of medical child abuse and caretaker-fabricated illness in a child—that is, claiming Mother exaggerated or fabricated his symptoms to procure unnecessary and harmful medical care.

G.M.'s father and Mother waived their rights to temporary custody hearings, and G.M. was placed in temporary custody with a foster family. G.M.'s father did not contest the CINC petition. Mother, however, challenged the adjudication.

The district court held an evidentiary hearing over the course of several days in the fall of 2018. During that hearing, the court heard testimony from multiple witnesses, including the reporting physician, several of G.M.'s treating physicians and health care providers, G.M.'s structured learning teacher from his home-schooling, and G.M.'s foster mother. Mother also testified, along with several of her friends and family members. The evidence presented during the hearing revealed the following history.

2

G.M. was born in 2006. Beginning in 2008, Mother took him to see a neurologist in Wichita, reporting a variety of symptoms. Over the course of several years, these reported symptoms included headaches (including migraine headaches), dragging his right leg, aversion to noise, seizures and epilepsy, sleep deprivation, and autism.

G.M. has been prescribed multiple medications for seizures since 2010, sometimes four or five medications at one time. Mother continued to report G.M.'s seizures despite this medication, and in 2014 doctors implanted a vagal nerve stimulator (VNS)—a device connected to the vagus nerve that releases electrical impulses to disrupt and decrease the number of seizures. In September 2017, G.M. underwent a second surgery to replace the battery in the VNS. In February 2018, G.M. had the VNS and was also taking four prescription medications to treat his seizures. At the hearing, a number of friends and family of Mother testified they had witnessed G.M.'s seizures. But G.M. has undergone at least nine EEGs, including two lasting several days, and none showed brain activity indicating seizures.

One of the side effects of G.M.'s anti-seizure medications was somnolence. G.M. began experiencing excessive sleepiness in 2014. Mother reported that this condition was particularly severe in the second half of 2016; during that time, G.M. would sleep all the time and would wet and soil the bed. Mother reported that she had to use a wheelchair to take G.M. to medical appointments because he would be asleep when they needed to go somewhere and was too big to carry. She also indicated G.M. was not able to attend school because of this sleepiness, compounded by his other medical conditions.

Excessive sleeping can lead to low blood-oxygen saturation. In March 2014, Mother reported that G.M.'s lips, hands, and feet turned blue while he slept. She thus obtained a pulse oximeter to measure G.M.'s oxygen saturation while sleeping; his saturation level was 84%. After doctors performed a sleep study in April 2014, G.M. was diagnosed with sleep apnea and placed on a continuous positive airway pressure (CPAP)

3

machine while sleeping. Because his saturation levels continued to dip below 90% even with the CPAP, G.M.'s doctor placed him on supplemental oxygen when asleep.

Another side effect of an anti-seizure medication prescribed to G.M. in October 2016 was elevated liver enzyme levels. To monitor G.M.'s enzyme levels, doctors had to draw blood every six weeks; G.M. was often uncooperative, and doctors feared they would have to sedate him during the draws. To avoid the possibility of sedating him for every draw, G.M.'s primary care physician referred him to a surgeon in August 2017 to implant a Mediport—a port which provides direct venous access for injections and draws.

Seemingly unrelated to the seizures, Mother took G.M. to see a pediatric gastroenterologist—Dr. Mayssa Zayat—in January 2013, reporting that G.M. was vomiting once per week. Dr. Zayat performed an endoscopy, which showed eosinophilic gastroenteritis in his throat. G.M. was placed on several dietary restrictions and prescribed medication to control the vomiting. In follow-up visits, Dr. Zayat found nothing wrong with G.M.'s throat, and G.M. showed no signs of continued vomiting. Nevertheless, over the course of the next year, Mother continued to bring him to Dr. Zayat, reporting that G.M. was now choking and gagging when eating, was a picky eater, and experienced routine pain and nausea. The gastroenterologist referred G.M. to an allergist in case he was experiencing an allergic reaction and performed two additional endoscopies—both of which came back as normal. G.M. was also within the normal weight range for children his age.

In July 2014, Mother consulted Dr. Zayat about the possibility of surgically inserting a feeding tube to make sure G.M. was receiving proper nutrition. The doctor explained she did not believe the feeding tube was necessary, as G.M. was within the proper weight range—he was actually gaining weight—and implanting a feeding tube is an invasive procedure. Nevertheless, at the urging of Mother, Dr. Zayat provided the phone number of a surgeon in case G.M. wanted to consult someone else about it.

4

When G.M. next met with Dr. Zayat in September 2014, the feeding tube (or G-tube) had been implanted. G.M., then almost eight years old, was being fed formula through the tube and had gained 12 pounds since his last visit. Dr. Zayat informed Mother that G.M. was being overfed and directed her to reduce his formula intake. Dr. Zayat scheduled a follow-up appointment, but G.M. and Mother did not show up for that visit. Dr. Zayat had no more contact with G.M. until the CINC case.

Mother also reported to one of his many physicians that she had observed excessive drooling by her son. As a result, G.M. was prescribed medication—one with side effects of urine retention and constipation. In 2016, Mother reported to his pediatrician that he was having trouble with urine retention. She took G.M. to a urologist, who prescribed additional medication and told her to catheterize G.M. every four to five hours. She attempted to do so but was unsuccessful; doctors subsequently placed G.M. on a different medication and instructed Mother to catheterize him every 10 to 12 hours as needed. At the hearing, Mother indicated she did so fairly frequently at the outset but now catheterizes him less often.

At the hearing, G.M.'s pediatrician—Dr. Mary Le—testified that G.M.'s medical condition and treatment had become progressively more complex, as Mother took him to see a neurologist, a metabolic geneticist, a sleep specialist, a gastroenterologist, a physical therapist, and an occupational therapist, and had occasionally sought treatment at Children's Mercy Hospital in Kansas City, Missouri. Dr. Le explained she had never witnessed G.M. have a seizure or cyclic vomiting, but rather all the information she relied on was provided by the child's mother. She also indicated she was not concerned with his weight or growth, as he was within (or at the top of) the normal range for those criteria. At one point, Mother reported dehydration and requested that G.M. receive intravenous fluids once per week, but Dr. Le refused to provide this treatment, as there were no signs G.M. was dehydrated.

Dr. Le also testified that although G.M. was mobile when she began seeing him in 2011, he was no longer able to independently walk or move around in 2017. Instead, G.M. would crawl or use a wheelchair. Mother testified that she only used a wheelchair for G.M. when she needed to take him somewhere and he was sleeping, and that he used crutches to move around at home.

As a result of these conditions—individually and in combination—Mother withdrew G.M. from school in April 2015, when he was eight years old. He did not receive home-schooling support from his local school district until November 2017. Even then, though a structured learning teacher was scheduled to come to his home twice per week, G.M. had a total of five 45-minute sessions between November 2017 and January 2018. And during those sessions, G.M. would often fall asleep (or he would be asleep when the teacher arrived).

In October 2017, Dr. Mary Moffatt, a child abuse pediatrician at Children's Mercy, received a referral expressing concern that G.M. might be the victim of medical child abuse. Medical child abuse, also known as caregiver-fabricated illness in a child, is the falsification or exaggeration of a child's symptoms in order to procure unneeded medical treatment that harms the child. Dr. Moffatt investigated this concern by reviewing G.M.'s medical files available in the Children's Mercy record system and observing him during a subsequent Children's Mercy hospitalization in late January 2018.

In early February 2018, Dr. Moffat concluded G.M. experienced medical child abuse and reported her findings to the State. In particular, she noted the absence of objective information to support several of G.M.'s diagnoses and treatments. She noted G.M. had not complained of any migraines at Children's Mercy, and staff had not witnessed any vomiting or sleep apnea during the current admission. G.M. had not failed to thrive because his weight has always been over the 90th percentile for his age since

6

implanting the feeding tube. Finally, G.M. had undergone at least nine EEGs over the years, all of which were either normal or not significantly abnormal, and his somnolence was likely due to his medications. Dr. Moffatt indicated the treatment G.M. had received for these diagnoses was painful, invasive, and had serious and compounding side effects that complicated and worsened his condition. The underlying CINC adjudication followed.

During the adjudication's pendency, G.M. was placed with a foster family. In the months between February 2018 and the evidentiary hearing that fall, G.M.'s treatment was simplified, and his medical condition vastly improved. G.M.'s feeding tube and Mediport were removed, and he lost weight (since he had been overweight when he was placed in temporary custody). He was weaned off most of his medications. At the time of the hearing, he was taking only three medications regularly; he had been prescribed a fourth as needed for seizures, but it had never been used. Though he still had the VNS, G.M. had discontinued taking all other seizure medications. When the hearing occurred in the fall, G.M. had experienced no problems with seizures, cyclical vomiting, or migraines, had not been catheterized, and no longer used a CPAP machine or supplemental oxygen. And G.M. had been attending school full time. His foster mother testified that he was able to swim and walk—in fact, run—by himself and could climb and descend stairs independently.

The district court held the adjudication over the span of several days in the fall of 2018. The State called several witnesses, including Dr. Moffatt, Dr. Zayat, Dr. Le, G.M.'s structured learning teacher, and the foster mother. In response, Mother testified and called other witnesses to corroborate her reports and G.M.'s diagnoses. For example, Mother called her longtime roommate, who also provided home health services to G.M. through a grant Mother had received. Mother's roommate testified G.M. was a picky eater and vomited every few weeks. She also observed him having seizures and at least once had to take him to the emergency room. Mother also called Katherine Welch, a physician

assistant who treated G.M. for several years at the Neurology Center in Wichita, who testified about his autism and aggressive behavior.

At the close of evidence, the district court took the matter under advisement. The court subsequently issued a written decision, finding G.M. to be a child in need of care. The court found G.M. had been "subjected to excessive medical treatment, procedures, and medications, all resulting in harm as medical abuse." Though the court concluded the evidence was insufficient to show caregiver-fabricated illness on the part of Mother (presumably finding she did not knowingly fabricate G.M.'s ailments), it nevertheless noted that G.M.'s medical treatment was based almost entirely on Mother's report of symptoms and that Mother failed to recognize her central role in the ongoing harm. The court also pointed to the drastic improvement in G.M.'s health when he was placed in foster care. The court concluded G.M. was without adequate parental control or care, including the care or control necessary for G.M.'s physical, mental, or emotional health, under K.S.A. 2019 Supp. 38-2202(d)(1) and (2). Mother now appeals.

DISCUSSION

Though Mother raises numerous questions on appeal, these can largely be divided into challenges to the sufficiency of the evidence presented by the State and procedural questions regarding discovery and the form of witness testimony. Having reviewed Mother's claims, we find no error and affirm.

1. *There is sufficient evidence in the record to support the district court's conclusion that G.M. is a child in need of care.*

The district court found that G.M. was a child in need of care under K.S.A. 2019 Supp. 38-2202(d)(1) and (2). Under these provisions, the State was required to prove by clear and convincing evidence that G.M. was "without adequate parental care, control or subsistence" for a reason "not due solely to the lack of [his mom's] financial means" and

8

that he was "without the care or control necessary for [his] physical, mental or emotional health." See K.S.A. 2019 Supp. 38-2202(d)(1), (2); *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). When reviewing such a determination, an appellate court must consider whether there was sufficient evidence presented from which the court could have concluded it was highly probable that G.M. was a child in need of the State's care under the statute. 286 Kan. at 705. In doing so, we view the evidence in the light most favorable to the prevailing party. We do not reweigh conflicting evidence or reassess the credibility of witnesses; instead, we rely on the fact-finder—who was present to observe the witnesses' demeanor and hear their testimony—for those judgments. 286 Kan. at 705.

We recognize this was an emotional and difficult case. But we find there is sufficient evidence in the record to support the district court's thoughtful and well-reasoned ruling. Although contested, there was evidence presented that much of G.M.'s treatment, procedures, and medications were unnecessary and duplicative, complicating and worsening his medical condition rather than improving his health. For example, G.M.'s severe somnolence, which led to multiple complications with his health, schooling, socialization, and mobility, was a side effect of a seizure medication G.M. stopped taking after being removed from Mother's care. In fact, the record reflects that much of G.M.'s previous medical equipment and procedures—the CPAP machine and supplemental oxygen for his sleeping, the G-tube for his feeding, the Mediport to monitor his liver enzyme levels, and the catheterization to assist with urine elimination—were no longer necessary after he was removed from Mother's home.

The district court found the State had not proved that Mother had caregiver-fabricated illness. But the court found the pervasive, unnecessary, and ultimately harmful medical treatment G.M. received, compounded by the fact that Mother did not recognize the harmful role she played—intentionally or unintentionally—in that treatment, demonstrated G.M. was a child in need of care under K.S.A. 38-2202(d)(1) and (2). There is ample evidence to support the court's finding.

9

In her arguments on appeal, Mother focuses on several pieces of evidence submitted, asking us to either disregard that evidence or view it through a different lens. For example, she argues the evidence did not support the court's finding that G.M. was receiving improper medical treatment and that the weight of the evidence did not support the court's findings regarding G.M.'s medical condition. She also argues that the "record reflects [she] was constantly monitoring the medication and attempting to reduce the medication" G.M. took. But while this case was contested, there is sufficient evidence in the record, particularly through the testimony of Dr. Moffatt and G.M.'s medical providers, that much of the treatment and medication G.M. received—based on Mother's report of symptoms and insistence of care—was unnecessary and led only to complications and side effects that prevented the child from socializing, going to school, and thriving. This evidence, along with the fact that, while hospitalized at Children's Mercy, G.M. did not suffer seizures, have difficulty sleeping, experience vomiting, or show many of the other symptoms Mother reported, supports the district court's findings. Contrary to Mother's arguments on appeal, it is not the role of this court to reweigh the evidence or come to different conclusions regarding the various witnesses' credibility.

Mother also argues her son should not have been adjudicated a child in need of care because she relied on and followed the advice of her son's medical providers in providing the treatment the court found was unnecessary and harmful. She points to K.S.A. 2019 Supp. 38-2201(d)(1), arguing the statute exonerates her actions since she relied on physicians' advice. But that subsection—stating in relevant part that "[n]othing in this code shall be construed to permit any person to compel a parent to medicate a child if the parent is acting in accordance with medical advice from a physician"—does not apply. Rather, K.S.A. 2019 Supp. 38-2201(d)(1) protects a parent who *refuses* to medicate his or her child, based on a physician's advice, when the State disagrees with that decision. That is not what has occurred here.

In fact, there was evidence presented at the CINC hearing that Mother rejected physicians' advice in procuring some of the treatment and procedures for her son, such as the feeding tube that Dr. Zayat opposed and thought was unnecessary and ultimately detrimental to G.M.'s health. Thus, the district court was presented with evidence that Mother insisted on medical treatment, medication, and procedures for G.M., sometimes against his treating physicians' judgment, and these procedures caused him to suffer mental, physical, and emotional harm. And while Mother was free to—and did—argue the inculpability of her conduct in light of G.M.'s physicians' actions, the district court did not find this line of argument persuasive.

In her final evidentiary argument, Mother argues the district court erred in considering evidence of the improvements in her son's health and lifestyle after the CINC petition was filed—that is, after he was removed from Mother's care. Citing no authority, she argues this post-petition evidence amounts to "backwards proof by using evidence of after-the-fact to prove medical abuse" and "experimentation [by the State] after the filing of the petition." We read this argument as asserting post-petition evidence of G.M.'s health is irrelevant to a case that seeks to determine whether he suffered medical abuse while in Mother's care—and disagree.

As a preliminary matter, we observe that multiple panels of this court have determined that Kansas law does not limit the evidence in a CINC adjudication to evidence obtained before a petition was filed. E.g., *In re D.H.*, 57 Kan. App. 2d 421, 429, 453 P.3d 870 (2019), *rev. denied* 311 Kan. __ (February 27, 2020); *In re B.G.*, No. 109,513, 2013 WL 4404574, at *5 (Kan. App. 2013) (unpublished opinion); *In re A.M.*, No. 108,102, 2013 WL 518019, at *3-4 (Kan. App.) (unpublished decision), *rev. denied* 297 Kan. 1245 (2013). While we are not bound by these decisions, we come to a similar conclusion here.

11

In Kansas, we start with the presumption that "[a]ll relevant evidence is admissible unless it is otherwise precluded by statute, constitutional provision, or court decision." *State v. Baker*, 287 Kan. 345, 363, 197 P.3d 421 (2008); see K.S.A. 60-407(f). Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevant evidence must be both probative and material. *State v. Marks*, 297 Kan. 131, 142, 298 P.3d 1102 (2013). Evidence is probative when it "furnishes, establishes, or contributes towards proof." 297 Kan. at 142. And evidence is material when it "tends to establish a fact that is at issue and is significant under the substantive law of the case." 297 Kan. at 142. Appellate courts review materiality of evidence de novo and its probative value for an abuse of discretion. 297 Kan. at 142.

As this court explained in *D.H.*, nothing in K.S.A. 2019 Supp. 38-2202(d) limits the temporal scope of evidence that can be presented in a CINC adjudication. The statute's only time-based limitation is that the minor in question must be "a person less than 18 years of age at the time of filing of the petition." K.S.A. 2019 Supp. 38-2202(d); *In re D.H.*, 57 Kan. App. 2d at 428. There is no question G.M. falls into that category. The two statutory provisions the district court found applicable—(d)(1) and (d)(2)—both consider whether G.M. "is without" parental care or control. Contrary to Mother's arguments, nothing in that language limits the temporal scope of the evidence that could be considered in his CINC adjudication.

Indeed, the questions presented in this case—whether there was evidence showing G.M. was without adequate parental care, control, or subsistence for not merely financial reasons and whether he was without the care or control necessary for his physical, mental, or emotional health—necessarily require the very comparison Mother claims to be improper. That is, what would the result be if G.M. were weaned off the daunting medical treatment, devices, and prescriptions he had experienced? The answer here is striking: G.M. has successfully been removed from multiple medications (and their crippling side effects). He no longer needs or uses the CPAP machine or oxygen for

12

sleeping. His feeding tube and Mediport were removed, and he eats normal food without limitation. He runs, goes up and down stairs, and has a happy demeanor. He goes to school and has friends. In short, evidence of his changed mental, physical, and emotional health was relevant to gauge the effect of his previous debilitating treatment. The district court did not err in admitting and considering this evidence.

In short, Mother has not apprised us of any evidentiary error by the district court. There is ample evidence in the record to support the district court's conclusion that G.M. is a child in need of care under K.S.A. 2019 Supp. 38-2202(d)(1) and (2).

2. *Mother's procedural arguments are without merit.*

In addition to her evidentiary claims, Mother raises four procedural arguments in her appellate brief. But these similarly fail to apprise us of error.

As a preliminary matter, Mother's procedural arguments are not presented with the specificity or explanation required to enable meaningful appellate review. As the appellant, Mother bears the burden of proving the district court erred. This requires Mother to explain what the district court did wrong, why the decision was erroneous, and how this affected the outcome of the proceedings below. For this reason, Kansas appellate courts have long stated that issues not adequately briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018); *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). This rule includes a prohibition of "conclusory statements, unsupported by legal citation." *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). That is, from an appellate court's perspective, failing to support a point with pertinent authority or explain why it is sound—even despite a lack of supporting authority or in the face of contrary authority—is akin to failing to brief the issue at all. *State v. Pewenofkit*, 307 Kan. 730, 731, 415 P.3d 398 (2018).

The conclusory statements contained in Mother's brief fall into this category of argument. For example, Mother asserts the district court erred because it did not grant her request that the court provide funds so she could hire an expert witness. Although she summarily cites K.S.A. 2019 Supp. 38-2215(b) in her brief without providing further explanation, this statute only applies to "fees and expenses approved by the court for appointed attorneys"—inapplicable here, since Mother declined appointed representation and hired her own counsel. Mother does not state who the expert was she would have hired, make a proffer of that expert's testimony, or explain why the absence of the expert prejudiced her ability to present her case. In short, she has not presented an argument we can meaningfully evaluate or review.

Likewise, Mother summarily argues that the district court should have imposed the "Goldwater Rule" for expert witnesses. See *State Farm Fire & Cas. Co. v. Wicka*, 474 N.W.2d 324, 332 n.6 (Minn. 1991). But she does not explain why this rule, imposed by the Minnesota Supreme Court in competency hearings requiring psychiatric evidence to be provided only by a psychiatrist who has personally examined the defendant, should apply in this case, when all the doctors who testified—including Dr. Moffatt—had at one point observed and treated G.M.

The remaining two procedural arguments similarly lack merit. Mother asserts that during the investigation in this case, Children's Mercy initially declined to provide her copies of G.M.'s medical records. These records had apparently been incorrectly designated as "restricted without court order." But when apprised of this erroneous designation, the district court ordered that the records be provided to Mother. Thus, she received the records in question. The district court did not err; it helped her obtain the records she sought. And Mother makes no claim that the delay in obtaining these records influenced the adjudication's outcome. Accord *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011) (a non-constitutional error is harmless without a reasonable probability it affected the trial's outcome).

14

Finally, the district court allowed Dr. Moffatt to testify at the hearing via Skype due to a conflict in another case and to avoid the travel from Kansas City to Wichita. When deciding to allow this remote testimony, the court required the parties to identify the documents they would be discussing with Dr. Moffatt beforehand to minimize uncertainty and allow for more meaningful testimony on direct and cross-examination. On appeal, Mother claims this procedural accommodation was an error because it made Dr. Moffatt more difficult to cross-examine.

We review a district court's decision to allow a witness to testify remotely for an abuse of discretion. See *In re K.E.*, 294 Kan. 17, 24, 272 P.3d 28 (2012). Under Kansas law, a witness may testify remotely "[f]or good cause in compelling circumstances and with appropriate safeguards." K.S.A. 60-243(a); see also *In re K.E.*, 294 Kan. at 24-25 (applying K.S.A. 60-243[a] to CINC hearing). The district court's decision to allow Dr. Moffatt to testify via Skype was within its sound discretion. Dr. Moffatt worked in Kansas City while the adjudication hearing was in Wichita. Given the conflicting schedules at play, the court did not err in allowing her to remain in Kansas City and testify remotely. The district court instituted sufficient safeguards to facilitate her remote testimony, instructing the parties to identify the documents they would show her before she testified. And Mother has not alleged Dr. Moffatt's remote testimony affected the trial—she merely asserts the technology made cross-examination more difficult.

In short, the appellant's brief fails to apprise us of any procedural or evidentiary error. We affirm the district court's thoughtful and well-reasoned decision.

Affirmed.